**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WISCONSIN**

GLOBAL FINISHING SOLUTIONS,
LLC,

      Plaintiff,

v.

CATALYTIC COMBUSTION
CORPORATION, JEFF KLOES, KEITH
LAUBE, and VICKI HAGBERG,

      Defendants.

Civil Action No. 16-cv-731

_____

**COMPLAINT AND JURY DEMAND**
_____

      Plaintiff Global Finishing Solutions, LLC ("GFS"), for its Complaint against Catalytic

Combustion Corporation ("Catalytic"), Jeff Kloes ("Kloes"), Keith Laube ("Laube") and Vicki

Hagberg ("Hagberg") (collectively, "Defendants"), alleges as follows:

**INTRODUCTION**

      1.     This is an action for trade secret misappropriation, breach of contract, and tortious

interference.

      2.     Defendants Kloes, Laube, and Hagberg are former GFS employees, each of whom

presently works at Catalytic.

      3.     Kloes and Laube—together with Catalytic—have willfully misappropriated

GFS's trade secret information in connection with Catalytic's development of paint booths that

directly compete with GFS's paint booth products.  Kloes, Laube, and Hagberg have also

violated their contractual duties to GFS in furtherance of Catalytic's development and marketing

of paint booths competing with GFS's products.

4.      GFS seeks an order enjoining Defendants' unlawful use of GFS's trade secret and other confidential information, an order requiring the impounding for destruction of all materials embodying GFS's trade secret and other confidential information and all paint booths, or components thereof, designed, developed or made using GFS's trade secret and other confidential information, an order preventing Defendants from marketing, selling or offering to sell any paint booths based upon GFS's trade secret or other confidential information, and other relief specified below.

**PARTIES**

5.      Plaintiff GFS is a limited liability company organized and existing under the laws of the state of Delaware with its principal place of business in Osseo, Wisconsin.

6.      Defendant Catalytic is a corporation organized and existing under the laws of the state of Wisconsin with its principal place of business in Bloomer, Wisconsin.

7.      Defendant Jeff Kloes is a citizen of the state of Wisconsin and resides in this District.  Upon information and belief, Kloes resides at N41223 County Hwy. E, Whitehall, Wisconsin 54773.  Until April 4, 2014, Kloes was Vice President of Sales in GFS's Industrial Division.  Kloes is currently Vice President of Sales at Catalytic.

8.      Defendant Keith Laube is a citizen of the state of Wisconsin and resides in this District.  Upon information and belief, Laube resides at 9445 24th Ave. S., Eau Claire, Wisconsin 54703.  Until September 3, 2015, Laube was a customer service manager at GFS.  Laube is currently a Senior Project Manager at Catalytic.

9.      Defendant Vicki Hagberg is a citizen of the state of Wisconsin and resides in this District.  Upon information and belief, Hagberg resides at 14425 Cty Rd. K, Osseo, Wisconsin

54758.  Until June 3, 2016, Hagberg was a Sales Support Manager at GFS.  Hagberg is currently in a sales and marketing role at Catalytic.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over GFS's federal trade secret misappropriation claim under 18 U.S.C. § 1836(c).  This Court has supplemental jurisdiction over the balance of GFS's claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the claims under the federal trade secrets statute that they form part of the same case or controversy under Article III of the United States Constitution.

11.     The exercise of personal jurisdiction over Catalytic comports with Wisconsin law and with the constitutional requirements of due process because Catalytic is a Wisconsin corporation, maintains its principal place of business in this District, has employees in this District, regularly transacts business and provides services in this District, and because the conduct complained of herein occurred in this District.

12.     The exercise of personal jurisdiction over Kloes comports with Wisconsin law and with the constitutional requirements of due process because Kloes is domiciled in this District and because the conduct complained of herein occurred in this District

13.     The exercise of personal jurisdiction over Laube comports with Wisconsin law and with the constitutional requirements of due process because Laube is domiciled in this District and because the conduct complained of herein occurred in this District.

14.     The exercise of personal jurisdiction over Hagberg comports with Wisconsin law and with the constitutional requirements of due process because Hagberg is domiciled in this District and because the conduct complained of herein occurred in this District.

15.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) because all Defendants reside in this District and because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

**FACTUAL BACKGROUND**

A.     **GFS's Leading Position In The Finishing Industry.**

16.     GFS is the world's leading provider of technologically advanced capital equipment solutions for the finishing industry.  GFS offers a diverse range of products, including the industry's most comprehensive line of paint booths.

17.     GFS's extensive paint booth offerings include standard and custom built open face paint booths, recirculating paint booths, and large equipment paint booths for the automotive, aviation, industrial goods manufacturing, marine, and rail industries, among many others.

18.     GFS's open face paint booths are used in industrial applications such as automotive/motorcycle refinishing, batch equipment painting, parts and components painting and wood finishing.  GFS offers more than 100 standard open face booth models.

19.     For example, the paint booth depicted below is a standard open face paint booth which can be used in many industrial settings such as for use in an automotive/motorcycle refinishing facility:



20. GFS's competitive advantage is derived largely from its design and engineering team's deep experience and expertise. For decades, GFS has invested many millions of dollars in research and development and has employed hundreds of electrical engineers, software developers, structural engineers, airflow specialists, code compliance specialists, and systems engineers to develop GFS extensive paint booth offerings.

**B.** **GFS's Confidential And Trade Secret Information.**

21. When a GFS customer requests a paint booth, GFS's design and engineering team creates three sets of technical drawings: Submittal Drawings, Manufacturing Drawings and Assembly Drawings. These drawings are created by GFS employees in the scope of their employment.

22.     As described below, Submittal Drawings and Assembly Drawings contain GFS's confidential information and are shared only with GFS's distributors and customers pursuant to certain confidentiality obligations.  Manufacturing Drawings, on the other hand, are not shared with or disclosed to anyone outside of GFS.  Manufacturing Drawings are the result of GFS's design expertise and contain the particularized proprietary technology and designs of GFS for each paint booth project.

23.     In addition to technical drawings, GFS's design and engineering team create and rely on additional confidential information to develop and implement paint booth technology.  For instance, GFS creates a Bill of Materials ("BOM") for each booth which identifies the parts and components used to develop and manufacture a particular paint booth.  A BOM contains GFS's internal component part numbers that are not known outside of GFS.  In addition, GFS designs the controls that operate each paint booth, including controls to achieve proper air flow and filtration.  The particular parts, components, and controls used for GFS's paint booths—and how they are used together—comprise additional confidential information of GFS.

24.     The information contained in the Submittal Drawings, Assembly Drawings and related documentation such as BOMs and controls instrumentation/documentation, together with the Trade Secret Information (defined below) contained in the Manufacturing Drawings, is hereinafter referred to as the "Confidential Information."

### a.   Submittal and Assembly Drawings

25.     Submittal Drawings show the basic physical dimensions and general appearance of the paint booth equipment.  The purpose of a Submittal Drawing is to allow the customer to determine the general size of the equipment, how it will be housed, and to establish that GFS can

provide the necessary airflow, filtration and ductwork for the particular application. Submittal Drawings are used prior to the need for detailed Manufacturing Drawings.

26.     After GFS completes the design and manufacture of a paint booth, the component parts are shipped to the customer with Assembly Drawings. Assembly Drawings show the physical dimensions of the individual fabricated component parts and are used by GFS to ensure that all finished parts are accounted for, properly crated, and shipped to the customer in the correct order. Assembly Drawings are also used by GFS or other third-party installers following shipment to perform parts assembly and integration of the equipment into the customer's building.

27.     Both Submittal and Assembly Drawings are provided to GFS's customers and distributors under agreements containing provisions prohibiting the disclosure or use of the drawings for any purpose other than that provided for by GFS.

### b. Manufacturing Drawings

28.     The heart of GFS's competitive advantage is achieved through its ability to design, engineer and manufacture paint booths of the highest quality to its customers' unique requirements. GFS's ability to design, engineer and manufacture such booths is captured in each set of Manufacturing Drawings. The GFS design, engineering and drafting teams prepare a set of Manufacturing Drawings for each project. Manufacturing Drawings consist of a number of detail sheets and "lay-flats" containing proprietary information regarding GFS's technology, equipment, components, and methods of manufacture for its paint booths.

29.     Unlike Submittal and Assembly Drawings, Manufacturing Drawings are never provided to GFS's customers or distributors or to any other third party. Manufacturing Drawings are internal to GFS and are used only by GFS personnel.

30.     Among other things, a Manufacturing Drawing contains the following information hereinafter referred to as the "Trade Secret Information": an identification of all component parts (including references to part numbers) and how they are integrated into the equipment; the gauge steel to be used; the dimensions of sheet metal and how they are connected, including drill hole patterns; the location where sheet metal and duct work are attached to the booth's steel support beams; detail on the dimensions and manufacture of the spray bays/chambers; the particular filtration components and systems, the size of ductwork and fans to be attached to equipment and the manner such equipment is to be integrated into the building's ventilation system; technical information on how the air flow will move through the booth and appropriate filtration will be achieved; the length and width of the exhaust chamber; and electrical information to show how the components are connected to one another and the equipment controls.  The Trade Secret Information derives independent economic value from being not generally known to, or readily ascertainable by proper means by, people outside GFS, and provides GFS with an economic and competitive advantage in the market.

31.     Manufacturing Drawings are maintained in electronic and print form.  When the equipment is completely manufactured and shipped, all hard copies of Manufacturing Drawings are gathered and retained in the project folder at GFS's facilities in Osseo, Wisconsin.  These hard copies are maintained pursuant GFS's document retention program, after which they are destroyed.

**C.      GFS Protects Its Confidential And Trade Secret Information.**

32.     GFS takes numerous steps to protect its proprietary information, including without limitation the Confidential Information and the Trade Secret Information.

33.     From time to time, GFS requires employees with working access to Confidential Information and Trade Secret Information to sign a GFS Confidential Information Agreement in a form substantially similar to the agreements attached hereto as Exhibit 1 (as executed by Kloes on April 4, 2008) and Exhibit 2 (as executed by Kloes on February 2, 2002).  The Confidential Information Agreement states that

> all designs, methods, processes, inventions, improvements, information, sales and financial data, customer lists and other trade secrets obtained or discovered by the EMPLOYEE while employed by Global Finishing Solutions ("Property") shall be the sole and exclusive property of Global Finishing Solutions.  EMPLOYEE will hold the property in trust and confidence for EMPLOYEE's use and will not disclose such property without first receiving the prior written approval of Global Finishing Solutions.

34.     GFS's Employee Handbook sets forth additional expectations and requirements of GFS employees with respect to Confidential Information, including without limitation the following:

> Many GFS employees have access to confidential information through the course of their job. Confidential information can only be used to perform job functions. Any other use is illegal and may result in prosecution and other sanctions.
>
> . . . .
>
> All confidential information must be stored in cabinets, shelves, desks, drawers, and rooms with locks and all such storage devices shall be kept securely locked when not in direct use and at the end of each employee work period. Locks should be checked regularly to make sure that they are operating properly. Each employee with need to have access to confidential information will be provided with a key, which will give that employee access only to the confidential information which he or she should need in the regular course of his or her duties.
>
> Lost keys must be reported directly to the Human Resources Manager. If an employee needs access to confidential information which is outside that employee's regular course of duties, that employee shall request access to the appropriate information from the Human Resources Manager, who will either give the employee a key to access the information or provide the information directly to the employee, who shall return both the key and/or the confidential information to the Human Resources Manager at the conclusion of that employee's regular work day.

. . . .

GFS is engaged in a business which requires that a strict code of confidentiality of information be maintained. No employee will store or keep information (either in written or electronic form) about any matter pertaining to the conduct of GFS' business off GFS premises without the prior written approval of the President of GFS.

(*See* Exhibit 3.)

35.     The GFS Employee Handbook also makes clear that GFS's employees may only access GFS information explicitly authorized by management and that GFS employees are responsible for properly safeguarding computer logins and passwords.  (*See id.*)

36.     GFS also takes measures to protect Confidential Information contained in Submittal Drawings and Assembly Drawings when such materials are properly provided to customers or distributors.  Each page of a GFS Submittal Drawing or Assembly Drawing contains a title block in the following form:



37.     The text on the title block reads:

IMPORTANT NOTE:  This print and all information contained therein is the sole property of Global Finishing Solutions, LLC ("GFS").  It is not to be used or reproduced in any manner or submitted to other parties for examination without the express written approval of GFS pursuant to a fully-executed contract or purchase order for GFS-manufactured equipment.  Customer may make and retain copies of the print for information and reference in connection with an equipment

order; however, this print is not intended or represented to be suitable for re-use by Customer or others on extensions of the order or any other project.  Any use without written verification is at Customer's sole risk and without liability to GFS, its affiliates, or agents.

38.     The title block also includes a copyright notice consisting of the copyright symbol "©," an identification of the copyright owner—Global Finishing Solutions, LLC—and the creation year of the relevant drawing—in this case, 2016.

**D.      Kloes' Employment With GFS.**

39.     Defendant Kloes began employment as a salesman for the predecessor entity to GFS in April 1988, was elevated to Territory Manager, and eventually was elevated to Vice President of Sales in GFS's Industrial Division for the last several years of his employment.

40.     During the course of his employment, Kloes oversaw all aspects of sales and marketing concerning GFS's paint booth business.  Kloes knew of, and had access to, GFS's design and development efforts concerning its paint booth technology and GFS's market information for paint booth applications.  Kloes had direct contact with GFS's customers, distributors, and sales teams with respect to all aspects of the paint booth business, including technical and financial issues.  Kloes also had direct contact with GFS's suppliers of component parts and materials used by GFS in connection with paint booths.  Accordingly, Kloes knew of and had access to all of GFS's cost of goods sold, cost of manufacture, and other financial issues facing GFS's paint booth business.

41.     Kloes had access to and regularly used the Confidential Information and Trade Secret Information—including BOMs, Submittal Drawings, Manufacturing Drawings and Assembly Drawings—in connection with his responsibilities.

42.     Kloes signed GFS Confidential Information Agreements throughout his employment with GFS (*see* Exhibits 1 and 2), and also received and acknowledged the terms of the GFS Employee Handbook.

43.     In connection with Kloes' separation from GFS and in consideration for a substantial severance package, Kloes signed a March 6, 2014 Letter Agreement attached hereto as Exhibit 4 (the "Kloes Agreement").

44.     The Kloes Agreement contains, among other things, a confidentiality provision prohibiting Kloes from disclosing any GFS confidential information, including the Confidential Information and Trade Secret Information:

> [Y]ou also agree to keep confidential and not to disclose any matter or information relating to [GFS], including, but not limited to, its operations, financial information and results, business plans, sales, customer and marketing information, pricing strategies, designs, technical know-how, trade secrets, working methods, purchasing and sourcing information, and all contact information relating to [GFS's] employees and customers (including telephone, cell phone, email and address lists).  You agree not to use such information for your own interest or for the interest of any third party.

(Exhibit 4 at Section 6.)

45.     Kloes further agreed to return any information to GFS, including Confidential Information or Trade Secret Information:

> You agree to return to [GFS] all correspondence, records, reports, files, drawings, quotations, documents, financial statements, price lists, employee handbooks and manuals, policies, building keys and passes, credit cards, calling cards, ID cards, telephone lists or directories, cell phones, communication devices, computers, electrically stored data, equipment, telephone, all contact information relating to [GFS]'s employees and customers (including telephone, cell phone, e-mail and address lists), and any other property owned by, provided by, or prepared on behalf of [GFS], or any parent or affiliate of [GFS], or purchased with [GFS]'s funds in your possession or control.

(Exhibit 4 at Section 5.)

46.     Kloes also agreed that "in the event [he] subsequently discover[ed] any such items in [his] possession, [he would] immediately return such materials to the [GFS]" and that he would "not keep, transfer or use any copies or excerpts of such items."  (*Id.*)

47.     The Kloes Agreement also contains a non-competition provision, which states as follows:

> [Y]ou agree not to, directly or indirectly, manage, operate, join, control, participate in the ownership, management, operation, or control of, or be employed by or as a consultant or adviser to, or connected in any other manner with any other person, corporation, firm, partnership, or other entity whatsoever that is engaged or, to your knowledge, plans to be engaged, in the design, manufacture, marketing, and sales and/or lease of spray finishing booths and all associated equipment and parts anywhere in North America.
>
> …
>
> Your obligations under this Section 7 shall remain in full force and effect through and until 4/5/2016. In signing this Letter Agreement, you acknowledge and agree that the scope, territory, and length of the restrictions contained in this Section 7 are both reasonable and necessary to protect the Company's business interests. The provisions of this Section 7 shall supersede and replace the terms of any noncompetition provisions contained within any other agreement that you executed during your employment with the Company.

(Exhibit 4 at Section 7.)

48.     Kloes' non-competition obligations expressly superseded the non-competition obligation set forth in the GFS Confidential Information Agreements and were in full force and effect until April 5, 2016.  (*Id.*)

49.     Kloes' employment with GFS terminated on April 4, 2014.  Kloes joined Catalytic shortly following his departure from GFS and prior to the expiration of his non-competition provision.

50.     Upon information and belief, Kloes is currently employed by Catalytic in a substantially identical role to his role at GFS.

**E.      Laube's Employment With GFS.**

51.      Defendant Laube began employment with GFS in June 1999 as a customer service manager.  He was elevated to oversee GFS's Installation Operations during his employment.

52.      In his positions at GFS, Laube knew of, and had access to, GFS's design and development efforts concerning its paint booth technology and GFS's market information for paint booth applications.  Laube had direct contact with GFS's customers, distributors, and sales teams with respect to all aspects of the paint booth business, including technical and financial issues.  Laube also had direct contact with GFS's suppliers of component parts and materials used by GFS in connection with paint booths.  Accordingly, Laube knew of and had access to all of GFS's cost of goods sold, cost of manufacture, and other financial issues facing GFS's paint booth business.

53.      Laube had access to and regularly used the Confidential Information and Trade Secret Information—including BOMs, Submittal Drawings, Manufacturing Drawings and Assembly Drawings—in connection with his responsibilities.

54.      Laube signed Confidential Information Agreements throughout his employment at GFS (*see* Exhibits 5 and 6), and received and acknowledged the terms of the GFS Employee Handbook.

55.      In connection with Laube's separation from GFS and in consideration for a substantial severance package, Laube signed the September 3, 2015 Letter Agreement attached hereto as Exhibit 7 (the "Laube Agreement").

56. The Laube Agreement contains, among other things, a confidentiality provision prohibiting Laube from disclosing any GFS confidential information, including the Confidential Information and Trade Secret Information:

> You also agree to keep confidential and not to disclose any matter or information relating to [GFS], including, but not limited to, its operations, financial information and results, business plans, sales, customer and marketing information, pricing strategies, designs, technical know-how, trade secrets, working methods, purchasing and sourcing information, and all contact information relating to [GFS's] employees and customers (including telephone, cell phone, email and address lists). You agree not to use such information for your own interest or for the interest of any third party.

(Exhibit 7 at Section 6.)

57. Laube further agreed to return any information to GFS, including Confidential Information or Trade Secret Information:

> You agree to return to [GFS] all correspondence, records, reports, files, drawings, quotations, documents, financial statements, price lists, employee handbooks and manuals, policies, building keys and passes, credit cards, calling cards, ID cards, telephone lists or directories, cell phones, communication devices, computers, electrically stored data, equipment, telephone, all contact information relating to [GFS]'s employees and customers (including telephone, cell phone, e-mail and address lists), and any other property owned by, provided by, or prepared on behalf of [GFS], or any parent or affiliate of [GFS], or purchased with the [GFS]'s funds in your possession or control.

(Exhibit 7 at Section 5.)

58. Laube further agreed "in the event [he] subsequently discover[ed] any such items in [his] possession, [he would] immediately return such materials to the [GFS]" and that he would "not keep, transfer or use any copies or excerpts of such items." (*Id.*)

59. Laube's employment with GFS terminated on September 3, 2015. Upon information and belief, Laube joined Catalytic shortly following his departure from GFS, and is currently employed by Catalytic in a substantially identical role to his role at GFS.

**F.      Hagberg's Employment With GFS.**

60.      Defendant Hagberg began employment with GFS on February 9, 1999 as a Sales Secretary and was elevated to Sales Support Manager during her employment.

61.       In her positions at GFS, Hagberg knew of, and had access to, GFS's design and development efforts concerning its paint booth technology and GFS's market information for paint booth applications.  Hagberg had direct contact with GFS's customers, distributors, and sales teams with respect to all aspects of the paint booth business, including technical and financial issues.  Hagberg also had direct contact with GFS's suppliers of component parts and materials used by GFS in connection with paint booths.  Accordingly, Hagberg knew of and had access to all of GFS's cost of goods sold, cost of manufacture, and other financial issues facing GFS's paint booth business.

62.      Hagberg had access to and regularly used the Confidential Information and Trade Secret Information—including BOMs, Submittal Drawings, Manufacturing Drawings and Assembly Drawings—in connection with her responsibilities.

63.      Hagberg signed a GFS Confidential Information Agreement on April 2, 2008 (the "Hagberg Agreement"), and received and acknowledged the terms of the GFS Employee Handbook.  The Hagberg Agreement is attached hereto as Exhibit 8.

64.      The Hagberg Agreement contains the following provisions regarding non-competition and non-solicitation:

> "EMPLOYEE covenants and agrees that during EMPLOYEE's employment and for a period of six months after termination for any reason, EMPLOYEE will not directly or indirectly own, manage, operate, or be connected in any manner which renders services or sells products competitive with the company.  Furthermore, EMPLOYEE shall not, directly or on behalf of any person or other entity, solicit or divert any customer or other EMPLOYEE of Global Finishing Solutions during that period.

(*See* Exhibit 8.)

65.     Hagberg's employment with GFS terminated on June 3, 2016.  The six-month timeframe for the non-competition provision in the Hagberg Agreement thus prevents Hagberg from being connected in any manner with an entity marketing paint booths and related technology to and through December 3, 2016.

66.     Hagberg joined Catalytic prior to the expiration of the non-competition provision in the Hagberg Agreement.  Upon information and belief, Hagberg is currently employed by Catalytic in a role substantially identical to her role at GFS.

**G.      The FBI's Ongoing Investigation Into Defendants' Theft Of GFS's Trade Secrets.**

67.     In August 2016, an agent from the U.S. Department of Justice's Federal Bureau of Investigation ("FBI") informed GFS that it was investigating potential theft and use of GFS's trade secrets by Catalytic and certain of its employees.

68.     In particular, the FBI informed GFS that it was investigating claims that employees of Catalytic had, and were using, GFS's technical drawings relating to paint booths.

69.     Prior to the time the FBI contacted GFS, GFS was unaware that employees of Catalytic had any Confidential Information or Trade Secret Information belonging to GFS.

70.     The FBI's preliminary investigation continues as of this date.

**H.      Defendants' Unlawful Use Of GFS's Trade Secret Information.**

71.     Catalytic has been engaged in the business of designing and supplying catalysts and related products for various industries and applications including muffler exhaust systems, natural gas powered engines, consumer appliances, power generation, and catalytic and thermal oxidizers.

72. Upon information and belief, prior to hiring Kloes and Laube, Catalytic had never designed, developed, marketed, or sold paint booths of any kind.

73. Upon information and belief, Catalytic did not have the technical expertise or experience to develop a paint booth business prior to hiring Kloes.

74. Upon information and belief, prior to joining Catalytic, Kloes did not have experience in the industries in which Catalytic operated at the time of his hiring, *i.e.*, the business of designing and supplying catalysts and related products.

75. Upon information and belief, Catalytic hired Kloes shortly after his separation from GFS in substantially the same role Kloes had at GFS to develop a new business line in paint booths and related technologies for Catalytic.

76. Upon information and belief, Catalytic was aware of Kloes' confidentiality and non-competition obligations to GFS at the time it hired Kloes.

77. Upon information and belief, Catalytic and Kloes then hired Laube shortly after Laube's separation from GFS to continue Catalytic's efforts to develop the new paint booth business.

78. Upon information and belief, prior to joining Catalytic, Laube did not have experience in the industries in which Catalytic operated at the time of his hiring, *i.e.*, the business of designing and supplying catalysts and related products.

79. Upon information and belief, Catalytic was aware of Laube's confidentiality obligations to GFS at the time Catalytic hired Laube.

80. Upon information and belief, Kloes and Laube kept and maintained copies of GFS's Submittal Drawings, Manufacturing Drawings, and Assembly Drawings and other Trade

Secret and Confidential Information after termination from GFS in violation of their contractual obligations to GFS.

81. Upon information and belief, beginning in mid-2015, Kloes and/or Laube disclosed GFS's Submittal Drawings, Manufacturing Drawings, and Assembly Drawings (the "Stolen GFS Drawings") and other Trade Secret and Confidential Information to Catalytic employees.

82. Upon information and belief, Kloes and/or Laube directed Catalytic employees to copy the Stolen GFS Drawings and to use them to design and manufacture a series of paint booths that would compete directly with GFS's products.

83. Upon information and belief, Catalytic employees copied the Stolen GFS Drawings and used them to design and manufacture Catalytic's new line of paint booths. Upon information and belief, the design of Catalytic's new line of paint booths is thus based largely on GFS's Trade Secret and Confidential Information reflected in the Stolen GFS Drawings.

84. Upon information and belief, to conceal this wrongdoing, Kloes directed Catalytic employees to remove GFS's title block from the Stolen GFS Drawings and to replace it with a Catalytic title block. Upon information and belief, Kloes also directed Catalytic employees not to save the Stolen GFS Drawings to Catalytic's computer network. Instead, upon information and belief, Kloes instructed Catalytic employees to maintain the Stolen GFS Drawings on thumb drives and other external devices, and in hard copy only.

85. Upon information and belief, at least some printed and/or electronic copies of the Stolen GFS Drawings were removed from Catalytic's facilities to a remote location in or around Spring 2016.

86.     In the summer of 2016, Catalytic and Kloes hired Hagberg to assist in marketing and selling Catalytic's new line of paint booths, in direct competition with GFS.

87.     Upon information and belief, Catalytic and Kloes were aware of Hagberg's non-competition obligations in the Hagberg Agreement.

88.     In addition to using the Stolen GFS Drawings to develop its paint booth technology, upon information and belief, Catalytic, Kloes and Laube have used other Confidential Information of GFS, such as GFS's BOMs containing the unique identification of GFS's particular components, in developing Catalytic's new line of paint booths.

89.     Kloes and Laube have contacted various suppliers of GFS inquiring about component parts and materials to be used in connection with developing paint booths for Catalytic.  The information Kloes and Laube have discussed with GFS's suppliers includes Confidential Information from the Stolen GFS Drawings and BOMs.

90.     For example, in early 2016, Kloes contacted Jim Dralle of A.J. Dralle, Inc. seeking to purchase from A.J. Dralle, Inc. the same paint booth filter material used by GFS in many of its paint booth applications.  A.J. Dralle, Inc. had never been contacted by, nor done business with, Catalytic prior to Kloes' outreach in early 2016.

91.     In or around August of 2016, Catalytic announced the launch of a new division called Catalytic Finishing Products, which offers paint booths that compete directly with GFS's products.

92.     Catalytic plans to feature its new paint booths at FABTECH—the leading finishing industry tradeshow—in November 2016:

> New for 2016-Paint Spray Booths are now available from Catalytic Finishing Products, a Division of Catalytic Combustion Corporation.  This new product line specializes in custom sizes and applications as well as having a full selection of standard catalog sizes and types to meet your specific painting and finishing

needs. Competitive pricing, superior quality components, on-time delivery, easy installation, and exceptional service are trademarks of all Catalytic Combustion Corporation brand products. We understand the coating and emissions process and we want to partner with you to provide the specific, reliable, quality solutions that help you perform at your peak.

(*See* Exhibit 9.)

93.     FABTECH bills itself to exhibitors as "the place where the industry's most influential buyers come to see the latest and greatest in metal forming, fabricating, welding and finishing. They seek out new technology and products to make their businesses more productive and profitable. No other event offers a better face-to-face opportunity to showcase your equipment and services to decision makers from around the world."

94.     Catalytic thus stands to immediately benefit from its unlawful acts when it exhibits its new product line to potential buyers from around the world at FABTECH in direct competition with GFS.

I.     **Kloes' Additional Breaches Of Contract.**

95.     Notwithstanding the confidentiality provisions and other provisions such as the non-disparagement provisions contained in the Kloes Agreement, in January 2016, Kloes authored an affidavit in connection with a dispute between GFS and one of its distributors, Managed Air Systems, Inc. ("MAS").

96.     Kloes authored the affidavit in support of MAS's threat of litigation against GFS. At the time Kloes authored the affidavit, MAS had not sued GFS and the parties were in the midst of settlement negotiations.

97.     Kloes' affidavit provided MAS with information relating to GFS's operations, financial information, business plans, customer and marketing information, working methods and other information expressly prohibited by the Kloes Agreement.

98.     In particular, Kloes' affidavit disclosed information relating to at least the following categories of information: (i) GFS's distribution network and relationships with its distributors, (ii) sales, performance and selection criteria relating to its distributors, and (iii) exclusivity provisions between GFS and its distributors.

99.     Kloes' affidavit also disparaged GFS and included derogatory statements about GFS's decision to terminate its relationship with MAS.

100.    Kloes provided his affidavit to MAS, and the information contained therein, without the consent or knowledge of GFS.

101.    Kloes provided his affidavit to MAS, and the information contained therein, on his own accord as there was no requirement for disclosure of this information such as a subpoena or other legal process.

102.    Kloes provided his affidavit to MAS, and the information contained therein, for the benefit of MAS.

103.    When MAS brought the affidavit to GFS's attention, GFS informed Kloes that his conduct in authoring the affidavit and providing the information contained therein to MAS was a violation of at least the non-disclosure and non-disparagement provisions of the Kloes Agreement.

104.    Kloes' counsel responded to GFS without addressing the violations of the Kloes Agreement.  Rather, his counsel simply stated that Kloes "will have no further contact with Managed Air Systems or its attorney about this dispute without a subpoena or court order or mutual agreement between the parties involved."  (Exhibit 10.)

## COUNT ONE
### Misappropriation of Trade Secrets
### Federal Defend Trade Secrets Act – 18 U.S.C. § 1836
### (Against Catalytic, Kloes and Laube)

105.     GFS incorporates the foregoing paragraphs as if fully stated herein.

106.     While employed by GFS, Kloes and Laube used, received, accessed, and had knowledge of the Trade Secret Information, which constitutes trade secrets under 18 U.S.C. § 1839(3).

107.     The Trade Secret Information derives independent economic value from being not generally known to, or readily ascertainable by proper means by, people outside GFS, and provides GFS with an economic and competitive advantage in the market.

108.     GFS has taken and continues to take reasonable measures to maintain the secrecy of the Trade Secret Information.

109.     The Trade Secret Information is related to products and services used in and intended to be used in interstate commerce.

110.     Kloes and Laube acquired the Trade Secret Information under circumstances giving rise to a duty to maintain its secrecy and limit its use.

111.     Kloes and Laube's conduct alleged herein constitutes improper disclosure and use of GFS's trade secrets by Kloes and Laube without GFS's actual or implied consent, and with knowledge that the Trade Secret Information was acquired under circumstances giving rise to a duty to maintain its secrecy and limit its use.

112.     Catalytic's conduct alleged herein constitutes improper acquisition of GFS's trade secrets with knowledge that the Trade Secret Information was acquired through breach and/or inducement of breach of Kloes and/or Laube's contractual duties to maintain the confidentiality of the Trade Secret Information.

113. Catalytic's conduct alleged herein constitutes improper use of GFS's trade secrets without GFS's actual or implied consent, and with knowledge that the Trade Secret Information was acquired under circumstances giving rise to a duty to maintain its secrecy and limit its use.

114. Catalytic, Kloes, and Laube's conduct alleged herein constitutes misappropriation of GFS's trade secrets in violation of the Defend Trade Secrets Act of 2016, 18 U.S.C. § 1836.

115. The misappropriation and misuse of GFS's trade secrets alleged above has caused and will continue to cause direct, irreparable harm and actual damages to GFS including, but not limited to, injury to its business and business relationships in an amount to be proven at trial.

116. Catalytic, Kloes, and Laube's conduct alleged above was and is willful and malicious. GFS is therefore entitled to exemplary damages and reimbursement of its reasonable attorneys' fees pursuant to 18 U.S.C. § 1836(b)(3).

## COUNT TWO
### Misappropriation of Trade Secrets
### Wisconsin Trade Secrets Act – Wisc. Stat. § 134.90
### (Against Catalytic, Kloes and Laube)

117. GFS incorporates the foregoing paragraphs as if fully stated herein.

118. While employed by GFS, Kloes and Laube used, received, accessed, and had knowledge of the Trade Secret Information, which constitutes trade secrets under Wisc. Stat. § 134.90.

119. The Trade Secret Information derives independent economic value from being not generally known to, or readily ascertainable by proper means by, people outside GFS, and provides GFS with an economic and competitive advantage in the market.

120. The Trade Secret Information is related to products and services used in and intended to be used in interstate commerce.

121.     Kloes and Laube acquired the Trade Secret Information under circumstances giving rise to a duty to maintain its secrecy and limit its use.

122.     Kloes and Laube's conduct alleged herein constitutes improper disclosure and use of GFS's trade secrets by Kloes and Laube without GFS's actual or implied consent, and with knowledge that the Trade Secret Information was acquired under circumstances giving rise to a duty to maintain its secrecy and limit its use.

123.     Catalytic's conduct alleged herein constitutes improper acquisition of GFS's trade secrets by inducing breach of Kloes' and/or Laube's contractual duties to maintain the confidentiality of the trade secrets.

124.     Catalytic's conduct alleged herein constitutes improper use of GFS's trade secrets without GFS's actual or implied consent, and with knowledge that the Trade Secret Information was acquired by Kloes and Laube—from whom Catalytic received the Trade Secret Information—under circumstances giving rise to a duty to maintain its secrecy and limit its use.

125.     Catalytic, Kloes, and Laube's conduct alleged herein constitutes misappropriation of GFS's trade secrets in violation of the Wisconsin Trade Secrets Act – Wisc. Stat. § 134.90.

126.     The misappropriation and misuse of GFS's trade secrets alleged above has caused and will continue to cause direct, irreparable harm and actual damages to GFS including, but not limited to, injury to its business and business relationships in an amount to be proven at trial.

127.     Catalytic, Kloes, and Laube's conduct alleged above was and is willful and malicious.  GFS is therefore entitled to exemplary damages and reimbursement of its reasonable attorneys' fees pursuant to Wisc. Stat. § 134.90(4).

## COUNT THREE
### Breach of Contract
### (Against Kloes)

128.    GFS incorporates the foregoing paragraphs as if fully stated herein.

129.    Kloes agreed to the Kloes Agreement as a condition of his separation from GFS.

130.    The Kloes Agreement was supported by adequate consideration and is enforceable.

131.    GFS has fully complied with all of its obligations under the Kloes Agreement.

132.    Kloes has breached the Kloes Agreement by engaging in the conduct alleged above.

133.    As a direct and proximate result of Kloes' wrongful conduct alleged herein, GFS has suffered damages in an amount to be determined at trial.  In addition, GFS has suffered and will continue to suffer irreparable harm unless Kloes' unlawful acts described herein are enjoined.  GFS has no adequate remedy at law.

134.    GFS is entitled to its attorneys' fees, costs and the return of payments made to Kloes under the Kloes Agreement.

## COUNT FOUR
### Breach of Contract
### (Against Laube)

135.    GFS incorporates the foregoing paragraphs as if fully stated herein.

136.    Laube agreed to the Laube Agreement as a condition of his separation from GFS.

137.    The Laube Agreement was supported by adequate consideration and is enforceable.

138.    GFS has fully complied with all of its obligations under the Laube Agreement.

139. Laube has breached the Laube Agreement by engaging in the conduct alleged above.

140. As a direct and proximate result of Laube's wrongful conduct alleged herein, GFS has suffered damages in an amount to be determined at trial. In addition, GFS has suffered and will continue to suffer irreparable harm unless Laube' unlawful acts described herein are enjoined. GFS has no adequate remedy at law.

141. GFS is entitled to its attorneys' fees, costs and the return of payments made to Laube under the Laube Agreement.

## COUNT FIVE
### Breach of Contract
### (Against Hagberg)

142. GFS incorporates the foregoing paragraphs as if fully stated herein.

143. Hagberg agreed to the Hagberg Agreement as a condition of her employment with GFS.

144. The Hagberg Agreement was supported by adequate consideration and is enforceable.

145. GFS has fully complied with all of its obligations under the Hagberg Agreement.

146. Hagberg has breached the Hagberg Agreement by engaging in the conduct alleged above.

147. As a direct and proximate result of Hagberg's wrongful conduct alleged herein, GFS has suffered damages in an amount to be determined at trial. In addition, GFS has suffered and will continue to suffer irreparable harm unless Hagberg's unlawful acts described herein are enjoined. GFS has no adequate remedy at law.

148. GFS is entitled to its attorneys' fees and costs under the Hagberg Agreement.

# COUNT SIX
## Tortious Interference with Contract
### (Against Catalytic)

149.     GFS incorporates the foregoing paragraphs as if fully stated herein.

150.     Kloes agreed to the Kloes Agreement and Laube agreed to the Laube Agreement as a condition of their separation from GFS.

151.     Hagberg agreed to the Hagberg Agreement in consideration for her employment with GFS.

152.     The Kloes Agreement, the Laube Agreement, and the Hagberg Agreement were each supported by adequate consideration and are enforceable.

153.     Catalytic had direct knowledge of the Kloes Agreement, the Laube Agreement and the Hagberg Agreement, and/or of Kloes', Laube's and Hagberg's contractual obligations under those agreements.

154.     Catalytic intentionally and actively induced Kloes to breach the Kloes Agreement.

155.     Kloes breached the Kloes Agreement as a direct and proximate result of Catalytic's intentional inducement.

156.     Catalytic intentionally and actively induced Laube to breach the Laube Agreement.

157.     Laube breached the Laube Agreement as a direct and proximate result of Catalytic's intentional inducement.

158.     Catalytic intentionally and actively induced Hagberg to breach the Hagberg Agreement.

159.     Hagberg breached the Hagberg Agreement as a direct and proximate result of Catalytic's intentional inducement.

160.    There is no justification for Catalytic's actions.

161.    GFS has suffered damages as a result of Catalytic's conduct alleged herein, including attorneys' fees resulting from GFS's efforts to protect and enforce its contractual relationships, in an amount to be specifically determined at trial.

162.    Catalytic's actions described herein were fraudulent, intentional, willful and wanton, and/or were committed with actual malice or with such gross negligence as to indicate a wanton disregard for GFS's rights.  GFS is entitled to punitive damages as a result.

163.    As a direct and proximate result of Catalytic's tortious interference, GFS has suffered irreparable harm and will continue to suffer irreparable harm until the Court enjoins Catalytic's actions alleged herein.  GFS has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

(a)    declare that Catalytic, Kloes and Laube have misappropriated GFS's Trade Secret Information in violation of 18 U.S.C. § 1836 and Wisc. Stat. § 134.90 and preliminarily and permanently enjoin Defendants and all acting in concert with each of them from directly or indirectly using, disclosing, or divulging to any person, firm, or corporation any trade secrets of GFS that Kloes or Laube learned or obtained during their employment with GFS or that Catalytic has since learned or obtained, whether for their benefit or the benefit of any other person, firm, or corporation;

(b)    declare that Kloes has breached the Kloes Agreement and that Laube has breached the Laube Agreement, and preliminarily and permanently enjoin Kloes, Laube, and all acting in concert with each of them from disclosing any matter or information relating to GFS, including, but not limited to, its operations, financial information and results, business plans,

sales, customer and marketing information, pricing strategies, designs, technical know-how, trade secrets, working methods, purchasing and sourcing information, and all contact information relating to the Company's employees and customers (including telephone, cell phone, email and address lists);

(c)     preliminarily and permanently enjoin Defendants from designing, developing, marketing or in any way maintaining or establishing paint booth products using any GFS Trade Secret or Confidential Information;

(d)     declare that Hagberg has breached the Hagberg Agreement and enjoin Hagberg from owning, managing, operating, being employed by, or otherwise connecting in any manner with Catalytic until December 3, 2016;

(e)     award GFS its damages for actual loss caused by Catalytic's, Kloes' and Laube's misappropriation of the Trade Secret Information and damages for any unjust enrichment to them caused by the misappropriation of the Trade Secret Information not addressed in computing GFS's actual damages;

(f)      award GFS a reasonable royalty for Catalytic's, Kloes' and Laube's misappropriation of the Trade Secret Information;

(g)     award GFS exemplary damages for Catalytic's, Kloes' and Laube's willful and malicious misappropriation of trade secrets pursuant to 18 U.S.C. § 1836(b)(3) and Wisc. Stat. § 134.90(4);

(h)     order the impounding for destruction of all unauthorized copies or reproductions of any GFS' drawings, BOM or other information obtained, used or otherwise accessed by Catalytic, Kloes and Laube;

(i)     order the impounding for destruction of all paint booths, or components thereof, design, developed or made using in any manner Trade Secret Information;

(j)     award GFS all damages proximately caused by Kloes's breach of the Kloes Agreement;

(k)     award GFS all damages proximately caused by Laube's breach of the Laube Agreement;

(l)     award GFS all damages proximately caused by Hagberg's breach of the Hagberg Agreement;

(m)    award GFS all damages proximately caused by Catalytic's tortious interference with the Kloes Agreement, the Laube Agreement and the Hagberg Agreement;

(n)     award GFS punitive damages for Defendants' willful, wanton and malicious conduct in an amount to be proven at trial;

(o)     order Defendants to reimburse GFS its reasonable attorneys' fees and costs pursuant to 18 U.S.C. § 1836(b)(3), Wisc. Stat. § 134.90(4), the Kloes Agreement, the Laube Agreement, and other applicable law;

(p)     award GFS prejudgment and post-judgment interest, as allowed by law; and

(q)     award GFS such other relief as this Court deems just and appropriate.

## JURY DEMAND

GFS hereby demands a trial by jury on all issues so triable.


DATED: November 5, 2016                FAEGRE BAKER DANIELS LLP

                                       *s/ Daniel J. Schwartz*
                                       Daniel J. Schwartz
                                       daniel.schwartz@faegrebd.com
                                       Kathryn A. Feiereisel

katie.feiereisel@faegrebd.com
311 S. Wacker Drive, Suite 4300
Chicago, IL 60606
Tel: (312) 212-6500
Fax: (312) 212-6501

*Attorneys for Plaintiff Global Finishing
Solutions, LLC*